# IN THE COURT OF APPEALS OF IOWA

No. 20-1733
Filed April 27, 2022

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**CHAD DIETRICK,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Kossuth County, Don E. Courtney,

Judge.


        Chad Dietrick appeals his conviction for murder in the second degree.

**AFFIRMED.**


        Martha J. Lucey, State Appellate Defender, and Ashley Stewart, Assistant

Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Linda J. Hines, Assistant Attorney

General, for appellee.


        Considered by Vaitheswaran, P.J., Tabor, J., and Vogel, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**VOGEL, Senior Judge.**

Chad Dietrick appeals his conviction for murder in the second degree, asserting the district court erred in refusing to give his requested jury instruction and in concluding the decedent's confidential medical records offered nothing exculpatory for the defense. Finding no error in the jury instruction or in the court's ruling on privileged matters, we affirm.

## I. Background Facts.

Between 12:14 and 12:47 a.m. on March 3, 2018, Chad Dietrick stabbed and killed his long-time partner, Krista. He was charged with murder in the first degree.

Dietrick filed a notice of justification defense and sought permission to obtain Krista's confidential medical records to determine if they contained information that might be exculpatory. The court held a hearing and ordered the records disclosed to the court. After an in camera review, the court concluded "the privileged information sought is not exculpatory and there is no compelling need for such information that outweighs [the] privacy interest of the privileged holder." Consequently, the court denied the defense access to the records.

According to trial testimony, at 12:47 a.m. on March 3, 2018, law enforcement received a call from the Kossuth County dispatch about an incident involving a weapon and an individual with a laceration. A sheriff's deputy responded to the residence of Dietrick's parents and found Dietrick seated in the kitchen area with a bloody towel wrapped around his left forearm. Dietrick informed the deputy that Krista came towards him to give him a hug but had a knife in her hand and tried to stab him in the stomach. Dietrick told the deputy he

knocked the knife away from Krista, he stabbed her twice as she tried to grab another knife, and then he ran. Dietrick was transported to the emergency room and treated for a gash on his left forearm. The deputy observed no other injuries on Dietrick.

The deputy then went to Dietrick's residence to check on Krista. He found her lying on her back on the living room floor, with her eyes open and her body covered in dried blood. An ambulance and paramedic were dispatched. An emergency responder arrived and confirmed Krista was dead.

Sheriff Steve Kollasch was informed of the situation. At about 2:10 a.m., Sheriff Kollasch and a deputy spoke with Dietrick at the hospital. Dietrick stated after he and Krista began arguing, he started to leave to go to his parents' home. Dietrick said Krista then came at him with a knife and put a gash in his forearm when he raised his arm to protect himself.[1] According to Dietrick, he "took the knife away from [Krista] and stabbed her . . . a couple of times." Dietrick related Krista then got another knife "and came at him again" so "he stabbed her two or three more times and then" went to his parents' home.

The evidence showed Dietrick's relationship with Krista was troubled in the months before her death and she was considering leaving him. Krista's friend testified Krista confided in her a couple of weeks before the killing that Dietrick

---

[1] Dietrick's laceration was about ten to twelve centimeters long and two to three centimeters deep. A doctor at the hospital testified Dietrick was able to move his fingers and his grip was good. Hospital staff repaired Dietrick's forearm under local anesthesia.

Ⅰ The doctor also testified Dietrick underwent a urine drug screen because he admitted to smoking marijuana. The urinalysis screen was positive for cannabis, negative for methamphetamine, and positive for amphetamine, which is a metabolite of methamphetamine.

"would fucking kill me." The friend also testified she was present on March 2 when Dietrick confronted Krista about a bank account of Krista's he had just discovered. The friend testified the ensuing argument between the couple led to her and Krista canceling plans they had for the next day to go bowling with their children. The friend exchanged text messages with Krista later that evening. At 12:14 a.m. on March 3, the friend received the final text messages from Krista—"Well I will let ya go to sleep I am soon. Chad wants to go.to bed too he says so ya" and "Guess I will be laying down for night soon."

A few days before her death, Krista told her adult son, "Chad's going crazy. . . . [H]e's just been all down my throat for so much. And then he said that if he can't have me to himself, then no one can." Her son testified Krista had bags packed at the time of her death. On March 2, Krista called her son during the day and asked that he and his sister not be home that night because "Chad wants alone time."

Deputy State Medical Examiner Dr. Jonathan Thompson testified he performed the autopsy on Krista and observed sixty-six sharp force wounds,[2] including deep wounds to her lungs and heart and twenty-two sharp force injuries to Krista's head and neck. Krista had a number of defensive wounds to her extremities, including a wound that severed a tendon on her left hand. Krista also had blunt force injuries on her head, neck, chest, and extremities.

Dr. Thompson testified Krista had a "low amount" of THC and a high level of methamphetamine in her system. On cross-examination, Dr. Thompson stated

---

[2] Two of the wounds showed signs of healing and were likely unrelated to the events leading to her death.

a person with high levels of methamphetamine in their system might exhibit "excited delirium," which "is typically characterized by an individual who seems almost resistant to any type of pain. They almost exhibit incredible bouts of strength, probably more than they typically would normally have. They can act quite irrational, delusional. And they're at an increased risk of having a sudden cardiac death."

A forensic toxicologist testified for the defense and opined a person with the level of methamphetamine in Krista's system

> would likely be impaired to a significant degree. Methamphetamine is a central nervous system stimulant. So at these concentrations, the individual is likely going to be very restless, anxious. There could be aggressive behavior demonstrated. Certainly, you know, an excited, erratic behavior depending on the individual. You could also find things like hallucinations or delusions. Obviously there would be significant insomnia as the individual would have racing thoughts, poor impulse control.

Dietrick testified Krista was not taking her prescribed medications and was self-medicating with methamphetamine. He said Krista's bags were packed because a week before her death he told her she needed to leave if she would not stop associating with particular individuals and using methamphetamine. Dietrick testified that, on March 1, he "told her that if things changed and that she had quit using that we could work things out and she would be allowed to stay." He believed it had been a good conversation.

But Dietrick testified that, on March 2, he discovered a bank account in Krista's name with more than $1000 in it and several syringes in Krista's car. According to Dietrick's testimony, the couple argued and smoked marijuana at their home that evening. Dietrick planned to stay with his parents that evening, and he

eventually went into the kitchen to say goodbye to Krista.  As he hugged her, she grabbed a knife from the drawer and cut his forearm.  Krista then ran into the dining room, and he pursued her "to get the knife away from her."  Krista turned around, said she was going to kill him, and came at him again with the knife.  The two struggled, and Dietrick was "able to pry the knife away from her."  Krista was hitting him, and Dietrick stabbed her in the stomach and collarbone.  Krista realized she was not going to get the knife back from him, so she grabbed another knife from the kitchen counter, charged past him to the living room, and then turned and "presented the knife."  Dietrick and Krista again struggled around the living room, into the dining room, and through the kitchen entryway.  Krista fell and lost her knife.  They continued to wrestle and eventually fell into her recliner.  After a bit more struggle, Dietrick threw the knife on the ground by the dining room, grabbed his glasses and keys, and left the house.  When he looked back, Krista was sitting on the floor in front of her chair.  Dietrick maintained he feared Krista would kill him.

On cross-examination, Dietrick acknowledged that in all the wrestling and scuffling with Krista and with two knives involved, he sustained no injuries after the cut on his forearm.  Dietrick agreed he was six foot, two inches tall and 215 pounds while Krista was five foot, four inches tall and 186 pounds during the altercation. He acknowledged he was angry with Krista about the secret bank account and, while driving home on March 2, he sent a text message with a picture of his speedometer to Krista showing he was traveling in excess of 100 miles per hour. He admitted that when he reached his parents' house, he told his mother Krista "might be dead."

In off-the-record discussions over jury instructions, the defense objected to the proposed instruction related to justification:

> A person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force as described in these instructions.

On the record, the defense stated: "[W]e believe that instruction is vague as it stands. There's no definition of illegal activity in that instruction. And so we will submit tonight an instruction we believe should be included that defines illegal activity and submit that to the court for consideration before we begin tomorrow."

The State acknowledged the off-the-record discussion and its resistance to defining illegal activity because the "stock jury instructions do not define it." The prosecutor stated, "It's my understanding based on our off-the-record discussion that the decision was the court was going to deny it, but they could submit the proposed supplemental instruction for the record." The court agreed that was its ruling.

Dietrick's submitted instruction had this additional paragraph after the above language:

> If illegal activity is supported by the evidence, it must have an immediate causal connection between the crime and the confrontation; stated differently, the evidence must show but for the defendant committing a crime, the confrontation resulting in injury to the victim would not have occurred.

According to the jury instructions, Dietrick was guilty of first-degree murder if the State proved: (1) Dietrick stabbed Krista; (2) Krista "died as a result of being stabbed"; (3) Dietrick "acted with malice aforethought"; (4) Dietrick "acted willfully, deliberately, premeditatedly, and with a specific intent to kill" Krista; and (5) Dietrick was not justified. The instructions defined "willful," "malice," and "specific intent."

8

The instructions also provided the elements of the lesser-included offenses of second-degree murder, voluntary manslaughter, and involuntary manslaughter.

With respect to the defense of justification, the jury received the following instructions:

**INSTRUCTION NO. 35**

The defendant claims he was justified in using reasonable force to prevent injury to a person, including the defendant.

The defendant was justified in using reasonable force if he reasonably believed that such force was necessary to defend himself from any actual or imminent use of unlawful force.

Reasonable force is only the amount of force a reasonable person would find necessary to use under the circumstances to prevent death or injury. If in the defendant's mind the danger was actual, real, imminent, or unavoidable, even if the defendant was wrong in estimating it or the force necessary to repel it, the force was justified if the defendant had a reasonable basis for his belief and responded reasonably to that belief.

It is not necessary that there was actual danger, but the defendant must have acted in an honest and sincere belief that the danger actually existed. Apparent danger with the defendant's knowledge that no real danger existed is no excuse for using force.

Reasonable force can include deadly force if it is reasonable to believe that such force is necessary to resist a like force or threat, or avoid injury or risk to one's life or safety.

The State must prove beyond a reasonable doubt that the defendant's use of force was not justified.

**INSTRUCTION NO. 36**

A person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force as described in these instructions.

**INSTRUCTION NO. 37**

If any of the following is true, the defendant's use of force was not justified:

1. The defendant did not have a reasonable belief that it was necessary to use force to prevent an injury.

2. The defendant used unreasonable force under the circumstances.

If the State has proved any of these beyond a reasonable doubt, the defendant's use of force was not justified. A person is justified in using reasonable force, including deadly force, if he

reasonably believes the force is necessary to defend himself from any actual or imminent use of unlawful force.

### INSTRUCTION NO. 38

If any of the following is true, the defendant's use of force was not justified:

1. The defendant initially provoked the use of force against himself, intending to use it as an excuse to injure [Krista].

2. The defendant initially provoked the use of force against himself by his unlawful acts unless:

a. [Krista] used force grossly disproportionate to the defendant's provocation, and it was so great the defendant reasonably believed he was in imminent danger of death or serious injury, or

b. The defendant withdrew from physical contact with [Krista] and clearly indicated to [Krista] that he desired to terminate the conflict but [Krista] continued or resumed the use of force.

If the State has proved any of these beyond a reasonable doubt, the defendant's use of force was not justified.

In closing, the State asserted, "This is not a self-defense case. This isn't a case where the defendant was using reasonable force. This is a case where the defendant was upset and angry all night. And he decided to take it out on the person he put in his contact list as 'cheating bitch.'"

The defense argued Dietrick was attacked with a knife and had no duty to retreat. The defense noted the medical examiner stated none of Krista's wounds were immediately disabling and a person with a high level of methamphetamine in their system might be angry, aggressive, and resistant to pain:

> [T]his evidence doesn't show what the State is trying to tell you it shows. It does not show some defenseless attack in one particular area where Chad is just thrusting and thrusting with the knife and killing Krista and that, you know, that he's on top of her stabbing her even after she's dead or something like out of a horror movie. That's not what this was. The evidence doesn't prove that. It doesn't come close to that. The evidence, in fact, is very opposite of what the State is trying to tell you. Again, lots of blood does not mean excessive force. This was a bloody scene. This is a sad story, regardless of which side. The police show up. They see this blood everywhere. They see a body. And it's just—it's bloody. You know, it's disturbing.

There's no doubt. But there's nothing inherent in the amount of gore, blood, sadness and pain that makes this murder. Chad Dietrick was defending himself from an attack.

During deliberations, the jury asked for further instructions concerning the difference between murder and manslaughter. The court instructed the jury to reread the instructions. The jury found Dietrick guilty of second-degree murder.

Dietrick appeals, contending the court erred in denying the defense access to Krista's confidential medical records and the wording of one jury instruction.

**II. Scope and Standards of Review.**

"We review jury instruction challenges for the correction of errors at law to determine whether the challenged instruction correctly states the law." *State v. Zacarias*, 958 N.W.2d 573, 579–80 (Iowa 2021).

"Nonconstitutional challenges to discovery rulings are reviewed for abuse of discretion." *State v. Leedom*, 938 N.W.2d 177, 185 (Iowa 2020) (citation omitted).

**III. Discussion.**

A. *Jury instructions.*

Dietrick maintains the court erred in failing to include his proposed language in the jury instruction about the duty to retreat. He argues Instruction No. 36 as given implied that any illegal activity countermanded his ability to "stand his ground."[3] Dietrick asserts "the lack of the clarifying jury instruction was prejudicial

---

[3] Dietrick's brief contains this statement: "The implication that any illegal activity *eliminates* the duty to retreat is an incorrect statement of law." (Emphasis added.) The court understands the statement is contrary to Dietrick's intended argument that he had no duty to retreat.

because the instruction misled the jury to believing that the use of marijuana forced Dietrick to retreat."

"Erroneous jury instructions are prejudicial and require reversal when they mislead the jury or materially misstate the law." *Zacarias*, 958 N.W.2d at 580 (citation omitted). We find no error for multiple reasons. First, the instruction given is a proper statement of the law. *See* Iowa Code § 704.1(3) (2018) ("A person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force . . . ."); Iowa State Bar Ass'n, Iowa Criminal Jury Instruction 400.1.

Second, Dietrick asserted before trial he would provide the court with a proposed instruction that "defines illegal activity." His proposed instruction did not do so. Dietrick's proposed instruction cannot be characterized as a "clarifying" instruction. Thus, the claim made here was not made to the district court and, therefore, is not properly preserved. *See State v. Opperman*, 826 N.W.2d 131, 133 (Iowa Ct. App. 2012) ("For an issue to be preserved the objectives of the error-preservation rules must be accomplished: challenges must be raised at the earliest possible point, opposing counsel must have notice and the opportunity to be heard, and the district court must have the opportunity to consider and pronounce a ruling on the issue."); *see also Zacarias*, 958 N.W.2d at 586–87 (citing *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002)).

Third, whether Dietrick's drug use was an "illegal activity" does not appear to be an issue argued at trial. Although the State briefly referenced Dietrick's comment that the couple had "smoked a bowl" during closing arguments, it did not argue Dietrick's marijuana use constituted an "illegal activity" that required him to

retreat. The State only mentioned "unlawful acts" during closing arguments in reference to a different jury instruction that stated use of force was not justified if Dietrick "initially provoked the use of force against himself by *unlawful acts*." (Emphasis added.) The State argued, "What that means is he committed an unlawful act because he wasn't defending himself. He was attacking Krista in the kitchen, in the dining room, in the front porch."

Fourth, the defense *did* argue he had no duty to retreat, and the question of justification was properly submitted to the jury. *See State v. Davis*, No. 19-0929, 2021 WL 616148, at *6 (Iowa Ct. App. Feb. 17, 2021) ("The fundamental question for the jury as factfinder was to determine whether the defendant's actions were justified."). The jury's verdict necessitates a conclusion the jury found the State proved the elements of second-degree murder: (1) Dietrick stabbed Krista, (2) Krista died as a result of being stabbed, (3) Dietrick acted with malice aforethought, and (4) Dietrick was not justified.

B. *Privileged records.*

Iowa Code section 622.10(4)(a) provides the exclusive method by which privileged information may be admissible in a criminal proceeding. *See* Iowa Code § 622.10(4)(b) ("Privileged information obtained by any means other than as provided in paragraph 'a' shall not be admissible in any criminal action."). Pertinent here, section 622.10(4)(a) provides:

> Except as otherwise provided in this subsection, the confidentiality privilege under this section shall be absolute with regard to a criminal action and this section shall not be construed to authorize or require the disclosure of any privileged records to a defendant in a criminal action unless either of the following occur:
> (1) The privilege holder voluntarily waives the confidentiality privilege.

(2)(a) The defendant seeking access to privileged records under this section files a motion demonstrating in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case. . . .

(b) Upon a showing of a reasonable probability that the privileged records sought may likely contain exculpatory information that is not available from any other source, the court shall conduct an in camera review of such records to determine whether exculpatory information is contained in such records.

(c) If exculpatory information is contained in such records, the court shall balance the need to disclose such information against the privacy interest of the privilege holder.

(d) Upon the court's determination, in writing, that the privileged information sought is exculpatory and that there is a compelling need for such information that outweighs the privacy interests of the privilege holder, the court shall issue an order allowing the disclosure of only those portions of the records that contain the exculpatory information.

The district court conducted an in camera review and made the required findings in writing. *See Leedom*, 938 N.W.2d at 188 ("We encourage district court judges in close cases to examine the records in camera."). Dietrick asks that we review the documents to determine whether the district court abused its discretion. *See id.*

"The legislature did not define the term 'exculpatory' in section 622.10, so we give that term its ordinary meaning: Exculpatory evidence tends to 'establish a criminal defendant's innocence.'" *Id.* (quoting *Exculpatory Evidence*, *Black's Law Dictionary* (11th ed. 2019)). We have reviewed the privileged records and come to the same conclusion the trial court did—the information is not exculpatory. We therefore affirm.

**AFFIRMED.**